**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ALISON K. JEFFREY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CASE NO. 07-CV-3301 |
| v. | ) | |
| | ) | District Judge Robert M. Dow, Jr. |
| MET LOGISTICS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Alison K. Jeffrey ("Plaintiff") claims that she was discriminated against by her employer Defendant Met Logistics, Inc. ("MET"), in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* MET filed a motion for summary judgment [66] and both parties filed motions to strike some or all of the other party's Local Rule 56.1 statements [76, 81]. For the following reasons, the Court denies both motions to strike [76, 81] and grants Defendant's motion for summary judgment [66].

**I.      Motions to Strike**

A party who wishes to argue that portions of an opposing party's statement of facts contain errors or are inadmissible on evidentiary grounds may file a motion to strike those portions of the statement. *Goltz v. University of Notre Dame du Lac*, 177 F.R.D. 638, 640 (N.D. Ind. 1997). "Pleadings that do not conform with the local rules may be stricken at the discretion of the court." *Id.* at 640 (citing *Bell, Boyd & Lloyd v. Tapy*, 896 F.2d 1101, 1103 (7th Cir. 1990)); *Pfeil v. Rogers*, 757 F.2d 850, 858 (7th Cir. 1985); *Graham v. Security Sav. & Loan*, 125 F.R.D. 687, 688-89 (N.D. Ind. 1989), *aff'd*, 914 F.2d 909 (7th Cir. 1990)). Indeed, it is the function of the Court, with or without a motion to strike, to review carefully both statements of

material facts and statements of genuine issues and the headings contained therein and to eliminate from consideration any argument, conclusions, and assertions that are unsupported by the documented evidence of record offered in support of the statement. See, *e.g.*, *Sullivan v. Henry Smid Plumbing & Heating Co., Inc.*, 2006 WL 980740, *2 n.2 (N.D. Ill. Apr. 10, 2006); *Tibbetts v. RadioShack Corp.*, 2004 WL 2203418, at *16 (N.D. Ill. Sept. 29, 2004); *Rosado v. Taylor*, 324 F. Supp. 2d 917, 920 n.1 (N.D. Ind. 2004). The Court is capable of redacting the statement of facts and disregarding interpretation or analysis of the facts, or unfounded assertions of fact found in the statement. The Court's scrutiny of material statements of facts applies equally to the party seeking summary judgment and the party opposing it.

For example, testimony must be based on personal knowledge. See, *e.g., Joseph P. Caulfield & Assocs., Inc. v. Litho Prods., Inc.,* 155 F.3d 883, 888 (7th Cir. 1998) (testimony "that was necessarily speculative and lacking in foundation * * * is insufficient"); Fed. R. Civ. P. 56(e). In addition, although the evidence supporting a factual contention need not be admissible itself, it must represent admissible evidence. By way of illustration, a deposition transcript usually is not admissible at trial but (obviously) may be used in support of summary judgment; however, a hearsay statement made during a deposition does not constitute adequate evidentiary support for a factual proposition. See *Eisenstadt v. Centel Corp.,* 113 F.3d 738, 742 (7th Cir. 1997) ("hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial, except that affidavits and depositions * * * are admissible in summary judgment proceedings to establish the truth of what is attested or deposed").

In this instance, the Court need not rule on all of the particulars of the parties' motions to strike because any statements or responses that contain legal conclusions or argument, are evasive, contain hearsay or are not based on personal knowledge, are irrelevant, or are not

supported by evidence in the record will not be considered by the Court in ruling on Defendant's motion for summary judgment. Many of the parties' assertions comply with Local Rule 56.1; some do not. Any paragraph or fact that is not supported by record evidence will be disregarded. Indeed, the Court has not relied on any evidence as to which the admissibility is disputed in its disposition of Defendant's motion for summary judgment.

Consistent with the discussion above, the Court denies both parties' motions to strike [76 and 81] and will rely only on material statements of fact which are both admissible and supported by the record compiled at the summary judgment stage. See Fed. R. Civ. P. 56(e); L.R. 56.1; see also *Davis v. Elec. Ins. Trs.*, 519 F. Supp. 2d 834, 836 (N.D. Ill. 2007); *Lawrence v. Bd. of Election Com'rs of City of Chicago*, 524 F. Supp. 2d 1011, 1014 (N.D. Ill. 2007).

## II.    Background

### A.    Standard

The Court takes the relevant facts from the parties' respective Local Rule 56.1 ("L.R. 56.1") statements. The Court resolves all genuine factual ambiguities in Plaintiff's favor (see *Foley v. City of Lafayette, Ind.,* 359 F.3d 925, 928 (7th Cir. 2004)), and takes no position on whose version of disputed factual matters is correct. See, *e.g.*, *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (stressing that on summary judgment, courts must look "at the evidence as a jury might, construing the record in the light most favorable to the nonmovant and avoiding the temptation to decide which party's version of the facts is more likely true").

L.R. 56.1 requires that statements of facts contain allegations of material fact and that those allegations be supported by admissible record evidence. See L.R. 56.1; *Malec v. Sanford,* 191 F.R.D. 581, 583-85 (N.D. Ill. 2000). The Seventh Circuit repeatedly has confirmed that a district court has broad discretion to require strict compliance with L.R. 56.1. See, *e.g., Koszola*

*v. Bd. of Educ. of the City of Chicago,* 385 F.3d 1104, 1109 (7th Cir. 2004); *Curran v. Kwon,* 153

F.3d 481, 486 (7th Cir. 1998) (citing *Midwest Imports, Ltd. v. Coval,* 71 F.3d 1311, 1317 (7th

Cir. 1995) (collecting cases)).  As noted above, where a party has offered a legal conclusion or a

statement of fact without offering proper evidentiary support, the Court will not consider that

statement.  See*, e.g., Malec,* 191 F.R.D. at 583.  Additionally, where a party improperly denies a

statement of fact by failing to provide adequate or proper record support for the denial, the Court

deems that statement of fact to be admitted.  See L.R. 56.1(a), 56.1(b)(3)(B); see also *Malec,* 191

F.R.D. at 584.  The requirements for a response under Local Rule 56.1 are "not satisfied by

evasive denials that do not fairly meet the substance of the material facts asserted." *Bordelon v.*

*Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000).  Finally, the Court

disregards any additional statements of fact contained in a party's response brief rather than in its

statement of additional facts.  See*, e.g., Malec,* 191 F.R.D. at 584 (citing *Midwest Imports,* 71

F.3d at l317).

### B.     Facts

Plaintiff Alison K. Jeffrey started as a temporary employee at Defendant Met Logistics,

Inc. on December 8, 2003.  According to Plaintiff, in a causal conversation early in her tenure at

MET, Plaintiff mentioned to Etsuko Shibata, MET's managing director and secretary, that after

Plaintiff gave birth to her first child in 1999, she had wanted to be a "stay at home mom."  Pl.

SOF ¶ 2.  On July 19, 2004, MET offered Plaintiff a job as a full time administrative assistant.

At that time, Plaintiff did not have an employment contract with MET; rather, she was an at-will

employee.  Her work hours were 7:30 a.m. to 4:30 p.m., Mondays through Fridays.[1]  As an

---

[1]  In her deposition, Plaintiff testified that her work hours were 7:30 a.m. to 4:30 p.m.  Then, in her
affidavit, submitted after her deposition, she testified that she did not have "set or required" work hours.
This is not the only instance in which Plaintiff's affidavit contradicts or "explains" her deposition
testimony.  A subsequent affidavit may be used to clarify ambiguous or confusing deposition testimony,

administrative assistant, Plaintiff performed general administrative duties and also performed certain financial, accounting, and human resources functions.

On March 11, 2005, Shibata sent Plaintiff an e-mail asking her to keep her personal phone calls to a minimum, saying that she represents "some HR responsibilities and I need to make sure that you are setting an example to the rest of the group." On March 24, 2005, Shibata sent Plaintiff another e-mail:

> Unfortunately, it has been brought to my attention by <u>several people</u> within the office today that there has been extended non-business chatting in the office during business hours during my absence. It was particularly disturbing that the chatting was not 5-10 minutes but lasting sometimes over one hour with other co-workers. I hope you can understand my frustrations when I was informed of this by several people who noticed this on several occasions.

(emphasis in original). Plaintiff responded that while she chats with co-workers from time to time, it is usually on breaks and she has "never had a conversation that lasted over an hour."

On August 11, 2005, Plaintiff received a performance appraisal from MET. In the review, Shibata noted that "Alison has been a reliable employee in terms of attendance and quality of work. Punctuality has been an area that has improved the last several months." According to Shibata, she made the punctuality comment to note a tardiness issue while encouraging Plaintiff to arrive at work on time. Def. SOF ¶ 13. Shibata claims that she verbally addressed Plaintiff's frequent tardiness prior to the performance appraisal. Def. SOF ¶ 12. Plaintiff admits that prior to the August 2005 performance appraisal, she had been late to work

---

or it may be based on newly discovered evidence. See *Slowiak v. Land O'Lakes, Inc* ., 987 F.2d 1293, 1297 (7th Cir. 1993) (quoting *Adelman-Tremblay v. Jewel Cos., Inc.*, 859 F.2d 517, 520 (7th Cir.1988)); see also *Maldonado v. U.S. Bank*, 186 F.3d 759, 769 (7th Cir. 1999) (holding that a supplemental affidavit cannot create a genuine issue of fact when the affidavit conflicts with prior deposition testimony without any suitable explanation). But where the party does not explain the conflict, self-serving, contradictory affidavits cannot create genuine issues of material fact. *Id*. Where Plaintiff's affidavit conflicts with her deposition testimony, the Court will rely on her deposition. However, if Plaintiff's affidavit merely elucidates her deposition testimony or adds newly discovered evidence, the Court will rely on both to piece together the factual scenario.

on more than one occasion; however, she denies that anyone at MET spoke to her about her tardiness prior to her review. On August 12, 2005, Plaintiff received an e-mail from Shibata, telling her "I need your cooperation to keep the lunch hour within the hour so we have ample phone coverage around lunch time. Just give me call if you are running late so I can be here to release others."

In September 2005, Tim Campbell, the president of MET, and Shibata had a falling out with a third MET shareholder, Mario Chen. Chen transferred his interest in MET and started a competing company called MET International.[2] After the change in ownership, MET reorganized and determined that it did not need a full time employee in Plaintiff's position. MET offered Plaintiff a position as a sales coordinator, effective December 1, 2005, and Plaintiff accepted the position at the same rate of pay that she was receiving as an administrative assistant. Plaintiff's new duties included assisting Jim Donovan (Operations Manager), Athena Metaxes (Marketing Manager), and the business development department in identifying potential customers, receiving requests for quotations, obtaining certain information from vendors, and preparing quotations. In addition, Plaintiff testified that it was part of her responsibilities to open one of the suites for other employees who came, and she agreed that if she was late and someone else showed up, that person would not be able to get in to the building. Jeffrey Dep. 54:1-8.

---

[2] MET employed Liping Zou from August 11, 2003 to September 19, 2005. In 2005, Lou took a maternity leave from MET and then returned to work. When Chen left MET to start MET International, Zou went with him. Prior to leaving MET, Campbell and Shibata told Zou that, with the concern with the company (presumably because of the tension between Chen Campbell, and Shibata), and given that she had just purchased a new house and had a baby, it might be a good idea for her to look for a new job. They told her of an opportunity, including a bonus, with a company called Unisys, if she left MET immediately. While Campbell and Shibata were offering to assist Zou in finding new employment, they also were concerned that Zou would leave MET and go to work for a competitor, specifically Chen. Shortly after she did just that, they filed suit against MET International, Chen, and Zou (among others) for breach of fiduciary duty, violation of the Computer Fraud and Abuse Act, breach of contract, and conversion.

On December 12, 2005, Metaxas, Plaintiff's direct supervisor, sent her the following e-mail:

> I always believe in being straight and honest with employees and to tell it like it is. I am trying to give you a heads up and to protect you. I know this is a new role for you and there is a learning curve. Just a word of advice, please try and get here on time because you know how the Chiefs [Tim Campbell and Etsuko Shibata] are about getting here on time. They notice and check those things and I was told that they have spoken to you about it before. Another thing, and just a head's up for this week, please try and be proactive and ask questions if you don't get something. Don't do it via email because with the hectic schedules that people have around here, it will most likely not get attended to and they will think that you are not doing your job. Physically walk up to them and ask to get the answers.

In response, Plaintiff thanked her for the "heads up on Friday, regarding me being late. I didn't have time to thoroughly explain * * * but again thank you, I know you were just giving me the warning." Plaintiff then said that when she is late, she always makes up the time either by staying late or coming in early on a different day.

On February 7, 2006, Plaintiff told Metaxas that she was pregnant with her second child. According to Plaintiff, Metaxas urged her to tell Campbell and Shibata, which she did the same day. Later that same day, after getting Plaintiff's approval, Metaxas sent an e-mail to other employees, announcing that one employee had gotten engaged and that Plaintiff was expecting her second child in the fall. In her affidavit, Plaintiff stated that she believed Campbell's and Shibata's attitudes toward her changed – for the worse – after she announced her pregnancy.

As part of her responsibilities as a sales coordinator, Plaintiff attended MET's weekly business development meetings and provided weekly recaps of customer quoting opportunities. In his affidavit, Campbell stated that he was not satisfied with Plaintiff's performance because he

did not think she was well-prepared.[3]  In her affidavit, Plaintiff contends that no one ever told her

that her performance was insufficient or that Campbell was dissatisfied.  However, e-mails from

Metaxas on March 24 and 27, 2006, and April 4, 2006, belie Plaintiff's affidavit.  On March 24,

Metaxas sent Plaintiff a reminder to send out the business development agenda:  "Please don't

forget to put out the BD agenda soon for the meeting * * * * Chiefs will be pissed if you don't

have it ready and I am just giving you fair warning."  Then, on March 27, Metaxas sent Plaintiff

the following e-mail:

> Welcome back from your vacation.  I just wanted to let you know that we had a
> meeting on Monday morning with all the managers about a variety of topics and
> one of the subjects was the quotations and proposals.  Please keep in mind that we
> have to keep it consistent in that a quote must go out in 1 day or less if possible,
> unless you have to go overnight to an agent, otherwise we will never get the
> business.  If you don't get a response from an agent overnight, let either myself or
> Tim or Etsuko know so we can call.  I was a bit surprised and disappointed to see
> that we hadn't gotten the IL to Athens quote out * * * before you had left on
> vacation.  Since this was an export quote, we could have gotten the best rate
> possible in the a.m. and sent it out before the afternoon so the agent didn't have to
> wait the weekend.  Tim was very upset about this on Friday at the BD meeting
> when you left and at Monday's meeting.

Metaxas then criticized her own work on the "Greece" quote and reiterated that both she and

Plaintiff should go to Jim Donovan or Brian Lawler for assistance.  Metaxas ended the e-mail

with the following:

> We depend on you to represent our corporate image on the proposals/quotations
> and we can't have Chief coming to us and asking us why something was not lined
> up properly or why a charge should've appeared on a certain line and it didn't.  I
> am not the micro-manager type and I don't think Jim is either, but when Chief
> comes to us about this stuff, it makes all of us look bad.  Remember if you need
> help or clarification on something, please always ask.  Thanks for all your help
> and hard work.  Let's keep it up!

---

[3]  In her complaint, Plaintiff alleged that Tim Campbell made a remark to her about pregnancy leave and
whether she planned to return to work after having the baby.  However, in her deposition, she stated that
Campbell never said anything to her on this topic.  Jeffrey Dep. 208:4-24, 209:1-24, 210:1.

Then, on April 4, Metaxas sent Plaintiff the following e-mail with the subject line "Reminder about being on time":

> Chief [Tim Campbell] mentioned to me this morning that you were late again. Please try to be on time, we are counting on you in the other suite to be the Chief over there when Jim is not around and also to set an example for others. You know that Chief is a stickler for time, he makes a note of these things and gets upset when someone doesn't adhere to the rules. I am just giving you a head's up * * * do it more than once or twice and you will really get on his bad side * * * * Please try your best to make it here on time. Thanks for your cooperation and understanding.

During her deposition, Plaintiff testified that she understood that Metaxas was giving her a warning that she should not be late for work. Plaintiff also admits to being late on March 10, 2006, although not an hour late, as Campbell attested to in his affidavit.

Plaintiff testified to having a conversation with Donovan, one of her supervisors in her role as a sales coordinator, about a week before her termination:

> Q: Can you tell us what was said at that time?
>
> A: He [Donovan] asked me when I was due and how long I planned to work, and if I had planned to take the FMLA. And I answered that the time of my due date was September 13th, I believe, but I would be having another C-section so that would be scheduled. At that point in time it was not scheduled, so I didn't know an exact date, but I told him unless I have any complications I planned on working up until that day, like I'd done in the past. And, yes, I planned on taking the FMLA and returning to work
>
> Q: Was there any discussion about the length of your leave?
>
> A: I don't recall * * * *
>
> Q: Did he – did Mr. Donovan say anything about why he was asking you?
>
> A: Actually, he told me it was off the record, he was just curious.
>
> Q: Were those his actual words, that it was off the record?
>
> A: Pretty much, yes.

(Jeffrey Dep. 104:17-24, 105:1-15).

On April 21, 2006, Plaintiff was late to work. Jeffrey Dep. 108:11-12. According to Plaintiff, she ran into Jim Donovan that morning, and he asked her if switching her hours to a later time would be more convenient for her. Plaintiff said no, that on that particular day, it would not have mattered what her hours were, she would have been late anyway. Jeffrey Dep. 108:1-24; 109:1-13. In her deposition, she said she did not recall if that was the first time she was late that week. *Id*. MET contends that it was the third time she was late that week. Later that same day, MET terminated Plaintiff's employment. Her termination letter cited her "continued tardiness and poor work performance" as the reasons for her discharge. While the letter acknowledged that she improved upon her tardiness every time it was addressed, it noted that after a while, she would show the same trend and that she has failed to follow the company's attendance standards.

About one month prior to Plaintiff's termination, Lawler received an e-mail from Kris Schmidt, who was scheduled to return from a disability leave of absence. In Schmidt's e-mail, she said she was contacting Lawler because her manager (Donovan) had not been able to tell her what her hours would be upon her return. Lawler responded as follows:

> My guess is you'll be assisting Alison as she is pregnant; we need to cover her new responsibilities * * * * You will be learning Import and Export quoting. The good thing is you'll have time with all of us here. Excellent knowledge to have to be 'sales coordinator.' Off the record of course, all of it ☺ We do not really expect her back. She took 4 years off for the first kid.

According to Lawler, it was common knowledge around the office that Plaintiff took four years off work after having her first child. He also testified that when he wrote, "We do not really expect her back," he was referring to himself as he personally did not expect Plaintiff to return to work.

On November 19, 2004, MET's IT manager, Tahir Sair, installed a program called Visual Time Analyzer ("VTA") on Plaintiff's computer.[4] Prior to the installation, Plaintiff had signed an acknowledgment that consented to the monitoring and inspection of her files, computer files, and e-mail. The program would track when Plaintiff logged in and out and also would monitor any web browsing that she did. Sair ran reports using the VTA software. According to the affidavits of Campbell and Shibata, it appeared to them that Plaintiff was spending an average of two hours every day on the internet on non-business websites or using her computer for personal reasons.[5]

Plaintiff submitted the affidavits of Nanette Kish and Kris Schmidt, former MET employees, who stated that it was common knowledge among the employees and management of MET that Plaintiff was occasionally late to work. However, both stated that Plaintiff would make up her time by working through lunch or staying late to complete tasks. Kish also stated that Jim Donovan often was late to work, but was not reprimanded.

## II.    Analysis

### A.    Summary Judgment Standard

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact

---

[4] Sair testified that between November 2004 and sometime in 2006, at the direction of Campbell, he also installed the program on the computer of Kauwana Pittman, a male employee in the accounting department. According to Campbell, Sair installed the software on Pittman's computer in 2005. Sair testified that he could not recall when the software was installed, only that it was approximately two years before his deposition in May 2008. When asked if that was in 2006, Sair responded that he did not know.

[5] MET did not submit the VTA reports in support of its motion for summary judgment, relying instead on the affidavits of Campbell and Shibata. Sair testified that between November 2004 and January 2006, he ran somewhere between one and ten" reports on Plaintiff's computer usage. The record before the Court does not reveal the exact dates that Sair generated the reports. However, based on the evidence submitted by Plaintiff, at least one report – detailing Plaintiff's web browsing history from January 9, 2006 through February 13, 2006 – was generated on or after February 13, 2006. It is clear from the report that Plaintiff visited several non-business related websites throughout the day.

and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party."  *Foley v. City of Lafayette, Ind.,* 359 F.3d 925, 928 (7th Cir. 2004).  To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted).   A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.  The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact.  See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id.* at 322.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).  "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]."  *Anderson,* 477 U.S. at 252.

No heightened standard of summary judgment exists in employment discrimination cases, nor is there a separate rule of civil procedure governing summary judgment in employment cases.  *Alexander v. Wisconsin Dept. of Health and Family Servs*., 263 F.3d 673, 681 (7th Cir. 2001) (citing *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396 (7th Cir. 1997)).  However, intent and credibility frequently are critical issues in employment cases that in many instances are genuinely contestable and not appropriate for a court to decide on summary

judgment. See *id.* Nevertheless, summary judgment in favor of the defendant is hardly unknown or, for that matter, rare in employment discrimination cases. *Wallace*, 103 F.3d at 1396.

### B.    Plaintiff's Title VII Sex Discrimination Claim

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or to otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's * * * sex." 42 U.S.C. § 2000e-2(a). The Pregnancy Discrimination Act ("PDA") brought discrimination based on pregnancy within the protections against sex discrimination. 42 U.S.C. § 2000e(k). The Act provides that pregnant women are to be treated the same for employment-related purposes as other persons. An unlawful employment practice occurs whenever pregnancy is a motivating factor for an adverse employment decision. 42 U.S.C. § 2000e-2(m); see also *Hunt-Golliday v. Metropolitan Water Reclamation Dist.*, 104 F.3d 1004, 1011 (7th Cir. 1997). The Seventh Circuit has recognized that Title VII "does not protect [a pregnant employee] from being fired without good cause. It protects [her] from being fired because of [her pregnancy]." *Gleason v. Meisrow Financial, Inc.*, 118 F.3d 1134, 1139 (7th Cir. 1997) (bracketed portions in original) (quoting *Visser v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 657 (7th Cir. 1991) (age discrimination case)). To prove a case of discrimination under Title VII, a plaintiff may show discrimination under either the "direct" or "indirect" methods of proof. *Atanus v. Perry*, 520 F.3d 662, 671-72 (7th Cir. 2008) (explaining the misleading nature of this nomenclature and re-explaining that the direct method may be proven with either direct or circumstantial evidence and the indirect method proceeds under the burden-shifting rubric set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 803 (1973)); see also *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007).

### 1. *Direct method*

Under the direct method of proof (also sometimes called "mixed motive" method), the plaintiff may introduce either direct or circumstantial evidence to create a triable issue as to whether the adverse employment action was motivated by a discriminatory intent. *Id*.; see also *Isbell v. Allstate Ins. Co.,* 418 F.3d 788, 794 (7th Cir. 2005); *Essex v. United Parcel Serv. Inc.*, 111 F.3d 1304, 1308 (7th Cir. 1997). In other words, the plaintiff must show either "an acknowledgement of discriminatory intent by the defendant or circumstantial evidence that provides the basis for an inference of intentional discrimination." *Dandy v. United Parcel Service, Inc.,* 388 F.3d 263, 272 (7th Cir. 2004) (citing *Gorence v. Eagle Foods Ctrs., Inc.,* 242 F.3d 759, 762 (7th Cir. 2001)). "Direct proof of discrimination is not limited to near-admissions by the employer that its decisions were based on a proscribed criterion (*e.g.*, 'You're too old to work here.'), but also includes circumstantial evidence which suggests discrimination through a longer chain of inferences." *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008) (internal quotations omitted).

The focus of the direct method of proof thus is not whether the evidence offered is "direct" or "circumstantial," but rather whether the evidence "points directly to a discriminatory reason for the employer's action." *Id*. at 671-72. Under the direct method of proof,

> [c]ircumstantial evidence demonstrating intentional discrimination includes: (1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination.

*Hemsworth v. Quotesmith.Com, Inc*., 476 F.3d 487, 491 (7th Cir. 2007) (quoting *Sun v. Bd. of Trs. of Univ. of Illinois*, 473 F.3d 799, 812 (7th Cir. 2007)). This last category is substantially

the same as the evidence required under the indirect method.  See *Venturelli v. ARC Community Servs., Inc.*, 350 F.3d 592, 601 (7th Cir. 2003).

Plaintiff argues that while each piece of evidence may not be not conclusive in itself, the totality of the evidence composes a "convincing mosaic of discrimination" perpetrated by MET against her.  *Walker v. Bd. of Regents of Univ. of Wis.*, 410 F.3d 387, 394 (7th Cir. 2005); see also *Paz v. Wauconda Healthcare and Rehab. Centre, LLC*, 464 F.3d 659, 666 (7th Cir. 2006).  Since Plaintiff does not have a "smoking gun," she relies on circumstantial evidence, which she argues suggests discrimination through a longer chain of inferences.  She alleges that the discrimination against her began early in her MET employment when she told Shibata that she wanted to be a "stay at home mom."  She says from that point on, MET had her on "pregnancy watch."[6]  Plaintiff claims that Campbell singled her out for installation of "spy" software on her computer and that Shibata spread the news of her wanting to be a "stay at home mom," resulting in a rumor that she had taken four years off of work after having her first child.  And the linchpin of her argument is that "Liping Zou's betrayal of MET," in which Zou left MET with Mario Chen to start up MET International, caused MET management to panic once Plaintiff announced her pregnancy, triggering Plaintiff's termination.

The problem with Plaintiff's carefully crafted scenario is that even viewed in the light most favorable to her, MET's discriminatory intent is not evident.  Although Plaintiff claims that MET put her on "pregnancy watch" in July 2004, MET can point to a similarly situated woman (Zou) who took a maternity leave after that (in 2005) and then was given various accommodations, not contested by Plaintiff, after she returned to work.  Plaintiff's theory is that Zou's subsequent departure from MET caused management to become suspicious of pregnant

---

[6]  Plaintiff's second amended complaint does not reference the "pregnancy watch," or the lengthy history of alleged discrimination described in her response brief.  Rather, in the complaint, Plaintiff alleges that MET management began treating her differently in early March 2006.

women; thus, when Allison became pregnant, MET decided to manufacturer a reason to fire her instead of accommodating her pregnancy. However, Plaintiff fails to present sufficient evidence to support this theory, while MET presents ample, documented evidence regarding its concerns over Allison's tardiness and other work-related issues.

Plaintiff points to her conversation with Jim Donovan, about a week before her termination, in which he inquired as to her due date and her FMLA expectations, as direct evidence of discrimination. However, there is nothing discriminatory about Donovan's statements or inquiry. As operations manager, Donovan was responsible for planning and managing his department so that it could operate effectively. His statements do not indicate an unwillingness to accept a leave of absence following the birth of a child. In fact, had he completely ignored her pregnancy, he might have been viewed as insensitive to her situation. Awkward comments – and it is debatable whether Donovan's inquiry could be classified as such – do not rise to the level of direct evidence of discrimination. See *Geier v. Medtronic, Inc.*, 99 F.3d 238, 242 (7th Cir. 1996) (finding that "awkward, insensitive and ungenerous" comments do not rise to the level of direct evidence of discrimination). Nor does Donovan's inquiry reflect unlawful motivations by invoking common stereotypes. *Cf. Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1044-45 (7th Cir. 1999) (finding that a "reasonable jury might conclude that a supervisor's statement to a woman known to be pregnant that she was being fired so that she could 'spend more time at home with her children' reflected unlawful motivations because it invoked widely understood stereotypes the meaning of which is hard to mistake").

Plaintiff also cites Brian Lawler's e-mail to Kris Schmidt as proof of MET's intentional discrimination. Shortly before Schmidt was scheduled to return from a leave of absence, she contacted Lawler because her manager had not divulged what her hours would be upon her

return.  Schmidt wrote, "Please, even if you can't confirm anything and it needs to be off the record, please tell me what you know about me, my hours, my 'duties,' whatever."  In response, Lawler "guess[ed]" that Schmidt would be assisting Plaintiff and wrote, "[w]e do not really expect her back * * * [s]he took 4 years off for the first kid."  Plaintiff argues that those statements, when viewed in conjunction with the other evidence, evince a discriminatory animus. Plaintiff contends that Lawler's use of the word "we" makes his statements attributable to MET; however, Lawler testified that when he wrote "we," he was referring only to himself, not MET in general, as he personally did not expect Plaintiff to return to work after her maternity leave.  The e-mails show that Lawler was responding to Schmidt's questions and speculating that Schmidt would be trained to cover Plaintiff's duties during her leave and if she did not return after the baby, which at least Lawler believed was likely.  And even if he meant others in addition to himself, Plaintiff has not presented any evidence as to who the others were and, more importantly, whether they were involved in the decision to terminate Plaintiff.  See *Swanson v. Legett & Platt, Inc.*, 154 F.3d 730, 734 (7th Cir. 1998) (finding that the usage of "we" alone does not suggest what group was intended, let alone the speaker's influence within the group, and that absent speaker's influence or knowledge in particular termination decisions, his statements have no relevance).

In any event, also fatal to Plaintiff's argument that Lawler's or Donovan's statements constitute direct evidence of discrimination is the requirement that isolated comments be "contemporaneous with the discharge or causally related to the discharge decision making process."  *Geier v. Medtronic, Inc.*, 99 F.3d 238, 242 (7th Cir. 1996).  In addition, the speaker must be a "decisionmaker" – the person responsible for the contested decision.  *Venturelli v. ARC Community Servs. Inc.*, 350 F.3d 592, 600 (7th Cir. 2003).  It is undisputed that neither

Donovan nor Lawler were the decisionmakers with respect to Plaintiff's termination. The decisionmakers were Campbell and Shibata, who were unaware of the conversations between Donovan and Plaintiff and the e-mails exchanged between Lawler and Schmidt. Plaintiff has not identified any statements made by Campbell or Shibata (or Metaxas, her direct supervisor) that reflect a discriminatory animus.

To tie in Campbell and Shibata, Plaintiff argues that following the announcement of her pregnancy, her managers began treating her differently, by being less tolerant of her tardiness and any mistakes in her work. However, the e-mails and affidavits submitted by both parties demonstrate that Plaintiff's managers were concerned about her tardiness and work performance both before and after she announced her pregnancy. On March 11, 2005, more than a year before her termination, Shibata asked Plaintiff to keep her personal phone calls to a minimum and to set an example to the rest of the group. Less than two weeks later, Shibata sent Plaintiff another e-mail, asking her to curb "extended non-business chatting in the office during business hours," after the conduct had been brought to her attention by "several people." Then, in her August 2005 review, Shibata noted Plaintiff's reliability in terms of attendance and quality of work and also noted that her punctuality had improved. Then, on August 12, 2005, Plaintiff received an e-mail from Shibata, telling her "I need your cooperation to keep the lunch hour within the hour so we have ample phone coverage around lunch time. Just give me call if you are running late so I can be here to release others." In December 2005, Metaxas, Plaintiff's direct supervisor, sent her an e-mail, asking her to "please try and get here on time because you know how the Chiefs are about getting here on time. They notice and check those things and I was told that they have spoken to you about it before." She also encouraged Plaintiff to ask questions if she did not understand something. In response, Plaintiff thanked her for the "heads

up on Friday, regarding me being late.  I didn't have time to thoroughly explain * * * but again thank you, I know you were just giving me the warning."  All of these reprimands occurred prior to Plaintiff's announcement about her pregnancy.

Then, after Plaintiff announced her pregnancy, in March 2006, Metaxas sent Plaintiff a reminder to finish the business development agenda:  "Please don't forget to put out the BD agenda soon for the meeting * * * * Chiefs will be pissed if you don't have it ready and I am just giving you fair warning."  On March 27, Metaxas sent Plaintiff the following e-mail:  "I was a bit surprised and disappointed to see that we hadn't gotten the IL to Athens quote out * * * before you had left on vacation * * * * Tim was very upset about this on Friday at the BD meeting when you left at Monday's meeting."  Metaxas then criticized her own work on the "Greece" quote and reiterated that both she and Plaintiff should go to Jim Donovan or Brian Lawler for assistance.  On April 4, Metaxas sent Plaintiff another e-mail with the subject line "Reminder about being on time," advising Plaintiff that Campbell "mentioned" to Metaxas that Plaintiff was late again.  She asked Plaintiff to "[p]lease try to be on time, we are counting on you in the other suite * * * and also to set an example for others.  You know that Chief is a stickler for time, he makes a note of these things and gets upset when someone doesn't adhere to the rules."  Plaintiff also admitted being late on March 10, 2006, although not an hour late, as Campbell attested to in his affidavit.  Then, on April 21, 2006, the day she was terminated, Plaintiff was again late to work.  MET contends that it was the third time she was late that week, although in her deposition, Plaintiff testified that she could not recall if that was the first time she

was late that week. In terminating Plaintiff, MET acknowledged that she improved upon her tardiness every time it was addressed, but then reverted back after the warnings had worn off.[7]

Plaintiff does not contest that these events happened; rather, she contends that her managers construed her tardiness and other shortcomings in a different light after her pregnancy and began looking for reasons to fire her. However, as demonstrated above, Plaintiff established a consistent pattern of arriving late to work, and her managers at MET consistently – both before and after her announcement – warned her about it. Then, on the day that she was terminated, Plaintiff was at least forty-five minutes late and told her boss it was unavoidable. While Plaintiff may have had a good excuse for her tardiness, the Court cannot conclude that her employer acted unreasonably in requiring her to abide by its attendance policies, particularly after warning Plaintiff several times. See *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994) (finding that employer's decision to fire pregnant employer, who was frequently tardy due to morning sickness, was not intentional discrimination). By being tardy on numerous occasions and not completing tasks on time, Jeffrey provided MET with ample justification for her termination. While the Pregnancy Discrimination Act requires an employer to ignore the employee's pregnancy, it does not require the employer to ignore her absence from work, unless the employer overlooks the comparable absences of nonpregnant employees. 29 C.F.R. § 1604.10(b) and App. to Pt. 1604 (EEOC Guidelines on Discrimination Because of Sex: Questions and Answers on the Pregnancy Discrimination Act); see also *Troupe*, 20 F.3d at 738.

Plaintiff's best fact is that her termination occurred two and a half months after she announced her pregnancy. However, "[t]emporal proximity, alone, is not enough to establish discriminatory intent." *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 939 (7th Cir. 2007); see also

---

[7] Even Nanette Kish and Kris Schmidt, former MET employees and friends of Plaintiff, attested that it was common knowledge among the employees and management of MET that Plaintiff was occasionally late to work.

*Bilow v. Much Shelist Freed Denenberg Ament & Rubenstein, P.C.*, 277 F.3d 882, 895 (7th Cir. 2001) ("The mere fact that one event preceded another does nothing to prove that the first event caused the second"). Plaintiff contends that the temporal proximity, combined with the other instances described previously, constitutes sufficient circumstantial evidence to create a triable issue as to whether the adverse employment action was motivated by a discriminatory intent. However, even taking all the instances together, they do not form a coherent picture of discrimination against Plaintiff. See also *Hunt-Golliday v. Metropolitan Water Reclamation Dist.*, 104 F.3d 1004, 1011 (7th Cir. 1997) (finding no discrimination despite the fact that plaintiff was suspended the day after announcing her pregnancy because she failed to present evidence that the two events were related); *Troupe*, 20 F.3d at 738 (finding that employer's decision to fire pregnant woman the day before her maternity leave was to begin was not intentional discrimination, even though plaintiff's manager told her on the way to the termination meeting that she was going to be terminated because the manager did not think she was coming back to work after having her baby). And because Plaintiff has not marshaled any direct evidence of discriminatory intent or animus on the part of supervisors, managers, or others involved in the termination decision, this case is distinguishable from other cases in which courts have found a triable issue of fact under a "mosaic" theory. See, *e.g.*, *Paz v. Wauconda Healthcare and Rehab. Centre, LLC*, 464 F.3d 659, 666 (7th Cir. 2006) (finding plaintiff had presented a "mosaic of direct evidence" sufficient to survive summary judgment when *supervisor* remarked that "Mexicans cause problems and come to the United States to take jobs from American people," told employees that she would not hire any more Mexicans because they just cause too many problems, and also made comments about plaintiff's pregnancy, her ability to do her job if pregnant, and repeated suggestions that plaintiff should have an abortion);

*Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1044-45 (7th Cir. 1999) (finding that jury verdict for employee on her pregnancy discrimination claim was supported by evidence that *manager* remarked to employee and to her co-workers at time of her firing that she would be happier at home with her children, by fact that the only other employee manager had fired was also a pregnant woman, and by evidence that employee's direct *supervisor* had commented that "If you have another baby, I'll invite you to stay home," "Oh, my God, she's pregnant again," and "[Y]ou're not coming back after this baby"). For all of the reasons stated above, the Court concludes that Plaintiff has failed to establish a triable issue of fact on her intentional discrimination claim under the direct method.

### 2. *Indirect method*

Under the indirect method of proof initially set forth in *McDonnell Douglas Corp. v. Green*, a plaintiff first must establish a *prima facie* case of discrimination. 411 U.S. 792, 802-04 (1973). In order to establish a *prima facie* case of sex discrimination, a plaintiff must establish that: (1) she was a member of a protected class; (2) she was qualified for the job or was otherwise meeting the defendant's legitimate performance expectations; (3) she suffered an adverse employment action; and (4) the defendant treated similarly situated employees outside the protected class more favorably. See *Fane v. Locke Reynolds, LLP,* 480 F.3d 534, 538 (7th Cir. 2007). If the plaintiff successfully establishes a *prima facie* case, a rebuttable inference of discrimination arises, and the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. See *Essex v. United Parcel Serv. Inc.*, 111 F.3d 1304, 1308 (7th Cir. 1997); see also *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 538 (7th Cir. 2007). Once the defendant provides a legitimate explanation, the burden then shifts back to the plaintiff to prove that the proffered justification is pretext. *Fane*, 480 F.3d at 538.

Plaintiff has not attempted to meet her burden of establishing a prima facie case of sex discrimination. Rather, she contends that, "since ample direct evidence of pregnancy discrimination * * * has been presented to the Court, there is no need to resort to the test articulated in the *McDonnell Douglas Corp. v. Green* case." Resp. Br. at 15. To venture a guess as to why Plaintiff chose not to proceed under the indirect method as well, the Court offers that Plaintiff probably realized that she did not have sufficient evidence to support the fourth element – that MET treated similarly situated employees who were not protected more favorably. Plaintiff did not come forward with any evidence that Campbell or Shibata, or any other manager with the requisite authority to hire or fire, failed to treat her just like any other employee with similar work issues. For instance, in 2005, MET installed the same VAT program on the computer of a male employee, Kawauna Pittman, to monitor the use of his computer, and subsequently terminated Pittman in June 2005. MET also presented evidence that from February 2005 to April 2006, it terminated four male employees and one (non-pregnant) female employee for performance reasons. Finally, Plaintiff points to Liping Zou as the linchpin in MET's ultimate decision to terminate Plaintiff. However, as previously indicated, MET gave Zou maternity leave as well as accommodations after she returned to work. Where a plaintiff has presented evidence regarding accommodations provided to another pregnant employee, such evidence does not show that the plaintiff fared worse than non-pregnant employees (see *Hunt-Golliday*, 104 F.3d at 1011), and, in this instance, it also fails to demonstrate that MET had it out for pregnant women following Zou.

**C.** **Sex Discrimination in Violation of the Illinois Human Rights Act**

In Count II of her second amended complaint, Plaintiff alleges sex discrimination in violation of the Illinois Human Rights Act (IHRA) based on the same set of facts. The IHRA

prohibits discrimination in employment. 775 ILCS 5/2-101 *et seq.* In analyzing employment discrimination claims brought under the IHRA, Illinois courts "have adopted the analytical framework set forth in United States Supreme Court decisions addressing claims brought under Title VII." *Zaderaka v. Illinois Human Rights Com'n*, 545 N.E.2d 684, 687 (Ill. 1989). The Court notes that Plaintiff does not mention Count II anywhere in her response brief, and consequently (and obviously) advances no arguments in support of her claim under the IHRA. As the Court already has determined that Plaintiff has not presented sufficient evidence of discrimination under either the direct or indirect method of proving a Title VII case, summary judgment also is appropriate, for the same reasons, on her state law claim asserted in Count II.

### D. Interference under the FMLA

In Count III of her second amended complaint, Plaintiff alleges that MET interfered with her rights under the FMLA by terminating her employment in April 2006. The FMLA entitles eligible employees of a covered employer to unpaid leave for up to twelve work weeks in a twelve month period for a serious health condition, including pregnancy. The FMLA makes it unlawful for an employer to interfere with an employee's attempt to exercise any FMLA rights. 29 U.S.C. § 2615(a); *Burnett v. LFW Inc*., 472 F.3d 471, 477 (7th Cir. 2006). In her response to MET's motion for summary judgment, Plaintiff failed to offer any admissible evidence or argument regarding this claim. In fact, as with Count II, Plaintiff failed even to mention her interference claim anywhere in her response brief. Although much of the same evidence advanced by the parties with respect to Count I would also be relevant to Count III, Plaintiff still is required to advance arguments and point to evidence that supports her claim, and her failure to do so can be deemed a waiver. See, *e.g.*, *Roe-Midgett v. CC Servs., Inc.*, 512 F.3d 865, 876 (7th Cir. 2008); *Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 810 (7th Cir. 2001) (finding that

plaintiff waived claim by failing to argue it before the district court in opposition to defendant's summary judgment motion); *but see Nabosny v. Podlesny*, 92 F.3d 446, 457 n. 9 (7th Cir. 1996) (non-moving party's failure to raise an issue in response to summary judgment motion does not result in waiver). Nevertheless, in the interest of justice, the Court will address Plaintiff's interference claim.

A review of the allegations in the complaint indicates that Plaintiff believes that MET terminated her in an effort to prevent her from exercising her rights under the FMLA. To prevail on an FMLA interference claim, a plaintiff must establish that (1) she was eligible for the FMLA's protections, (2) her employer is covered by the FMLA, (3) she was entitled to leave under the FMLA, (4) she provided sufficient notice of her intent to take leave, and (5) her employer denied her FMLA benefits to which she was entitled. *Burnett*, 472 F.3d at 477. In moving for summary judgment, MET argued that it had a legitimate business reason for its action and would have discharged her whether or not she was pregnant and eligible for FMLA leave. *See Kohls v. Beverly Enterprises Wisconsin, Inc.*, 259 F.3d 799, 804-05 (7th Cir. 2001). As set forth in detail above, MET claims that it fired Plaintiff because of her tardiness and lack of focus in her new position, not because she was pregnant. Plaintiff does not dispute that she was late for work, that her performance as a sales coordinator was criticized, or that she used her computer at work for personal reasons. As set forth in greater detail in analyzing Plaintiff's discrimination claim, the e-mails and affidavits submitted by both parties demonstrate that Plaintiff's managers were concerned about her tardiness and work performance both before and after she announced her pregnancy. By being tardy and not completing tasks on time, Plaintiff provided MET with a legitimate business reason for her termination, and, consequently, MET did not interfere with her right to a benefit to which she was entitled.

### III.    Conclusion

For the foregoing reasons, the Court grants Defendant's Motion for Summary Judgment [66] and denies the parties' motions to strike [76, 81].  Accordingly, judgment will be entered in favor of Defendant MET and against Plaintiff Alison Jeffrey on all claims.

Dated:  March 13, 2009                                   _____

                                                         Robert M. Dow, Jr.
                                                         United States District Judge